Please the court. My name is John Bryson from the Department of Justice on behalf of the Environmental Protection Agency. With me at council table is Claudia Massman, Special Assistant Attorney General on behalf of the state of Montana. EPA appeals from a judgment making EPA responsible for establishment under the Clean Water Act of total maximum daily loads for impaired water bodies in the state of Montana. We submit the court erred in finding EPA responsible for this work and in imposing a detailed prescriptive injunction as a remedy. Plaintiffs sought to enforce the TMDL portions of the Water Quality Standard Programs of Section 303 of the Clean Water Act, a program that under Congress's design places primary responsibility on the states. The states set state water quality standards for their waters, identify the water bodies that are not meeting those standards, and then establish total maximum daily loads of pollutants that can be discharged into those water bodies without violating water quality standards. EPA's role is limited to approving the state's work and if EPA finds the state's list of impaired waters or a particular TMDL is deficient, correcting those deficiencies. Otherwise, as this court has held recently in San Francisco Bake Keeper, cited in our brief, EPA has no duty to act unless the state unambiguously expresses a decision not to establish TMDLs and submit them to EPA for approval. But that's not the case here, as the district court so found in dismissing plaintiffs' other claims, a ruling that the appellees do not appeal. The district court nonetheless made EPA responsible on the legal theory that EPA's failure to consider the pace of TMDL development and to take further action was arbitrary and capricious under the Administrative Procedure Act 5 U.S.C. 706-2A. But neither the district court nor the plaintiffs have identified a final agency action on the issue of the pace of TMD development that would be an appropriate predicate for such a ruling. Under this Court's decision in the ONRC action case, this failure means plaintiffs had no statutory standing to obtain relief under that provision of the EPA. Okay. Why don't we stop right there for just a second and... I'm sorry? Let's stop right there for just a second. Can I focus you on this decision letter of June 23, 1998? It appears at 370? Yes. Right. What is that? That is a decision where the letter transmits the decision which is attached to it, which approves Montana's Section 303 list of waters that still need TMDLs. Are there any legal consequences that flow from that decision? Well, the list is approved, and the only legal consequence really is for the state of Montana. Then that becomes their list from which they work in order to carry out their responsibilities under the state to prepare the TMDLs. So what does this decision mean for EPA? It's the end of its process of deciding whether to approve that list. Is there anything further for the EPA to do? No. Now, the next thing that would happen would be if individual TMDLs are then prepared and submitted by the state of Montana to EPA, and then EPA reviews and approves or disapproves. So your point about the total maximum daily load of pollutants, it's just that it's not yet been established? The point is that the next... For some polluted... For some waters. For some waters. And it has been for others. Right. And EPA has approved them, but it's not for all of them. So the next step... So when, in your view, would there be a final agency decision here that the plaintiffs could challenge? Well, they can... In this case, they can challenge the approval of the list. The list is resubmitted every two years. That generates a new approval. And then they can challenge individual TMDLs. The only other action that they can bring in federal court against EPA is a citizen suit action in order to enforce a mandatory duty, which they also brought in this case, but the court held that EPA had no mandatory duty to do anything more, such as take over and be responsible for developing all the TMDLs itself, rather than having the state do that from time to time, as the statute requires. And the district court rejected that claim. And in Baykeeper, it was clear the district court was absolutely correct. The plaintiffs did not appeal that judgment. It's binding on them. That claim has now been finally adjudicated. As the program goes along, there will be more TMDLs. There will be more lists. The state may change the water quality standards. They would have to be approved by EPA. But all this is set out in Section 303. And this is the legislative scheme, which the bench. Well, I understand what was concerned to the district. What was of concern to the district court was that in making this decision, this final decision by the EPA, EPA failed to consider the timeliness of the state's action in adopting TMDLs. Well, that's correct, Your Honor. I don't know why that's not a – I don't know for purposes of finality why that's not – why that issue cannot be reached in this case. It can't be reached under the Arbitrary and Capricious State because of the – under the LNRC, you have to identify an agency action that addresses the matter. And it's not only a matter of – it's a matter of two things here. The record doesn't show that there is an agency action that addresses the matter. And you can't say that they left something out and, therefore, didn't consider a relevant factor because neither the statute nor the EPA's regulations requires the EPA to consider that when they are reviewing the list. And that's not a matter in dispute. Neither the district court nor the plaintiffs here contend that the statute or the regulations say that when EPA reviews the list. Well, let me ask this. How long do the – does the State have to develop its TMDL? Under the statute, as this Court held in San Francisco Baykeeper, what the statute requires is that the State submit them from time to time. And the statute does not have the schedule. It doesn't have an end date. And neither do EPA's regulations. EPA doesn't have that in its regulations, perhaps in recognition, I believe, of the fact that it's an enormous undertaking. The State originally thought it could do this in 10 years. Very recently, the State legislature has concluded that that's not possible and has extended the deadline another five years. This is an enormous undertaking. But Congress decided it was the State's responsibility to do that, but they did not give a deadline, an end date, for completing that. Let's assume for a moment that it is a final decision. Then what flows from that? Well, the best that they could argue was that it was arbitrary and capricious not to consider this. And that has to be anchored in what the requirements of the statute and the regulations of the EPA promulgated to implement the program. And the decision, the only thing that was final was the decision to approve the list. And neither the statute nor the regulations require the agency to consider how quickly the DMDLs are going to be developed over time. So it could not have been arbitrary and capricious if indeed there's some statutory finality consistent with the ONRC versus BLM case. Well, in fashioning the remedies that it did, at least the district court thought were appropriate, it resorted, you know, to its equitable path. I think the best character it did, Your Honor, but it presumed that what it was enforcing was a mandatory duty. All the cases that it relied on and all the cases the plaintiffs cite to support that are instances where the court found a mandatory duty for EPA to do the DMDLs. But this Court found there was no mandatory duty for EPA to do the DMDLs. So it instead gave relief under 5 U.S.C. 76-2A, which is a finding that the agency's decision was arbitrary and capricious in some way. And under standard APA law, what's required is a remand to the agency to address a matter that it may not have addressed, which is factually what happened in this case. But he said it didn't. Didn't the district court remand to some extent here? Well, of course, it sent it back to EPA, but it imposed a time, end time, for the DMDLs to be completed. And it imposed a series of sort of remedial, well, it's almost prophylactic in some way, injunctive requirements, which were also erroneous for their own individual reasons. For example, the requirement that neither EPA nor Montana can issue an MPDS permit unless a DMDL is completed wasn't based on any consideration of what the law requires. And the Supreme Court in Arkansas versus Oklahoma held that there's no requirement in the statute, and there's certainly none in EPA's regulations, that a discharge can't be authorized if it's going to have any effect negative on the water quality. Wasn't that provision that was modified later? It was only modified to the extent that the original injunction ran against EPA, and the modification was to add the state of Montana as subject to the same injunction. Because in Montana, the MPDS permits are administered on a delegated responsibility. And on the remand, of course, the other things that we are appealing are that this sort of gratuitous advance holding that every failure to meet a milestone in the injunction or the schedule would be a final agency action, and so it could be sued on. In our view, that's totally anticipatory, and it doesn't serve to remedy any identified evil here that the agency may have committed. And finally, the district erred in refusing to relieve EPA of the obligation to establish a DMDL for any water body that's taken off the list of the 1996 list. The court chained EPA and, inferentially, Montana to the 1996 list. Each two years, a new list is created, and the list may change. Orders may fall off. We asked the district court to amend the injunction to not require DMDLs that were removed from the list, which is consistent with Montana state law, and he refused. But it's a waste of resources for EPA to prepare those DMDLs if they do not need them or are not on the list. Can I ask you a question? Yes. I want to go back for a moment. Whatever happened to the requirement that the states submit their TMDL list before 1979? What happened to that deadline? Wasn't there a 1979 deadline at some point? The statute required first EPA to identify all those pollutants for which it submitted. Right. And EPA did that. And so the first submission on identification of the water bodies was due six months after that. So that and that date was 1979. What do you say if that date came and passed and states failed to comply? Well, I think in this record it shows that Montana did so. Eventually. Eventually. But it wasn't until 1992. I mean, they were administering this program all along and in the course of which they were doing water quality analyses and so on, but they did not actually formally submit identifications to EPA until much later. In the early, late 80s, EPA published a regulation which required the identification take the form of a list and then it be submitted every two years. And the first list under that regulation was required in 1992, and Montana submitted that list and has submitted a list every two years thereafter. And there was no time limit at all to develop their TMDLs in connection with the list? This Court, in the paykeeper decision, has construed the statute as saying that it's time to time in accordance with the priorities that are identified on the list. But that there is no end date under the statute and there is no end date under the regulations. Now, EPA, as a matter of administrative practice, has over the years ratcheted up its supervision of this program and has issued guidance which has requested and urged the states to get more organized. And the guidance in 1997 said that the states should set up schedules. But that's guidance. It's not in the regulation and it's not in the statute. I'll reserve the remaining time for rebuttal if there are no more questions. Fine. Good morning, Your Honors. My name is Jack Tucholsky. I'm here on behalf of Friends of the Wild Swan. And I want to jump right to the issue that Your Honor was discussing in terms of final agency action because if this Court finds final agency action, then we win on the liability issue because that's the only issue they've raised. They have not tried to defend their decision as rational, i.e., not arbitrary and capricious. They simply say we don't have standing to bring the case. Under Bennett v. Speer, we have to establish two things for final agency action, the first being that it's the consummation of the agency's decision-making process, and the second being that legal consequences flow. And EPA's June 23, 1998 order, and that's what they call it, is a final agency action. I don't think that they can seriously dispute that the regional administrator signed that document. Which order is that? Is that the one approving the list? Yes. Go ahead. The so the question then becomes does legal do legal consequences flow from that? And the answer to that is they absolutely do because it is that approval that determines which water bodies are going to receive TMDLs in the coming years. And me in Montana, that means some streams will get TMDLs and remedy the very serious nonpoint source pollution problems that our state faces, and other streams will just fall by the wayside and maybe they'll come back around the next time. Now, they claim that they did not approve the schedule. But if you look to the four corners of the document that EPA approved that was submitted by the state of Montana, it says ER page 57. Just a second. What page? ER. ER page 57. That's the table of contents for the Montana. For the Montana. ER 57. Yes. And it says right there, it refers you to page 18 for a proposed schedule of TMDL development. So that's what EPA submitted to Montana is a proposed schedule. And then if you look at the document, it goes on to page 18 of the document, ER at 73. They set out their schedule for TMDL development over the course of the next five or six years. And it included 20 projects here, 20 projects. Montana is conveying this to EPA. That's correct, Your Honor. And EPA is then approving this. And it ran all the way out until June of 2003, you know, where they claimed they were going to approve 150 TMDLs from conservation districts and 150 TMDLs from the Forest Service. This is out of 3,000 that they need. And this is what the district court said was arbitrary. It said the schedule didn't identify which water bodies were going to receive TMDLs. The schedule didn't address the fact that for years they had listed all these high-priority waters that they said, we've got to do TMDLs right away. They're high priority. And then they did nothing. Well, I guess with his argument, isn't his argument a little bit different? The EPA would say, well, that's fine and dandy. The state can say all they want about how quick they're going to do this. But isn't his argument that EPA, in its review capacity, it doesn't have a duty to impose any kind of timeliness requirement? And whatever the state wants to do, it's fine. And I would disagree with that, first of all. That is their argument, yes. Do I understand his argument? I believe that is. I don't think that they dispute that that document isn't final agency action of some kind. But what they're saying is that it's not final agency action with respect to approval of a schedule. And if you look at 40 CFR 130.7D1, the plain language of that regulation says, EPA and the states shall establish a schedule for TMDL development. And then if you look at the policy guidance that Mr. Bryson referred to, issued in 1997, that document says, establish schedules. And so whether EPA had a mandatory duty in the sense of a mandamus, you need to have a schedule by X number, by a certain date. We're not making that argument. We lost on that claim. That's what Baykeepers held. And, in fact, Judge Malloy presaged that decision and threw out our mandatory mandamus duty. But then he came back and said, in light of all the delay that has gone on here and the recalcitrance on behalf of EPA and the state, and in light of their own policy and their own regulation that says you should have a schedule, and in light of the fact that you submitted a schedule and you issued an approval letter and it was a lousy schedule, I'm going to find that to be arbitrary and capricious because you didn't even discuss your own memos, your own legal requirements, and so forth. And you say you didn't even discuss. Are you talking about EPA or are you talking about the state? EPA didn't. And in their approval letter, what they state is that we approve this submission. And, again, I say the Court just looks to the four corners of the submission to see what EPA approved, because they did, in fact, approve a schedule. And what they say at the end of the letter, and I think it's in the ER at page 370  and they never did that. So what they are doing, essentially, is trying to draw a complete circle of immunity around a citizen's ability to enforce Section 303D of the Clean Water Act. And Congress used the language from time to time, but that doesn't mean there's no obligation for them to timely ensure the TMDLs are implemented. What this Court held in Baykeepers is you don't have to do the TMDL at the same time you identify the water quality limited segment. That's the holding in Baykeepers. And we didn't appeal our similar Baykeepers claim. Frankly, I agreed with Judge Malloy. But if you uphold EPA's position, it means a state can submit a list and do a few TMDLs to sort of get over Baykeepers. And then the state does absolutely no TMDLs. They keep submitting these lists of impaired waters. They keep submitting these schedules promising to do it. And EPA just rubber stamps it year after year after year. Now, let me ask you this. If it's okay, or not okay. Let me rephrase this. If EPA didn't adequately discuss or address its consideration of this timeliness issue in its decision, why isn't the remedy just to remand it to EPA? Here, the district court not only did that, but overlaid on it a fixed deadline as part of an injunctive order. Okay. And, you know, to get to that question, we presume that the court we had statutory standing to bring our claim to the court properly founded arbitrary and capricious. And then we get to the remedy phase. And I think that EPA overstates the injunctive nature and understates the remand nature of the remedy. Judge Malloy said, I'm remanding this back to EPA. What Judge Malloy had in front of him when he crafted this remedy was the fact that EPA had entered into consent decrees in 10 or 15 states with very similar schedules. And so why would EPA be entering in these consent decrees if they didn't feel they had an obligation to do it within a timeframe? And then EPA, in its filings with the court on remedy, said a schedule consistent with the Montana state law is reasonable. That this is a reasonable end date and that our own expert, and this was he submitted an affidavit. We were arguing for a much quicker schedule, like three years. And Judge Malloy rejected that and said, okay, EPA's expert says you can get it done by 2007. The state passed a law that says you can get it done by 2007. You've entered into consent decrees with many other states that have similar timeframes. I'm going to tell you to get it done by 2007, but I'm going to leave it to you completely to decide which streams you're going to do, in which order, and how you want to prioritize the development of these TMDLs. And so the court didn't take over the TMDL program. It remanded it with instructions to get the job done because of the years of failure. If EPA, if it had just remanded it to EPA, we could have been on this treadmill where EPA says, well, we've taken a look at it again. And by golly, we're not going to do a schedule because we don't think it's necessary. And then we'd have to challenge that and so forth. And, you know, understanding, as you recognize, that this was all supposed to happen in 1979. We're playing catch-up here. And the court, in the exercise of its equitable. There's only the list of the designated streams or lakes or waters is supposed to have been developed by 1979. No. The statute says, I mean, there's no. Not the TMDLs. The statute says the TMDLs shall be submitted from time to time. I agree with the court. They all didn't have to be done in 1979. The first list has to have to be established. But I think it's a fair reading when you consider the, you try to interpret the statute consistent with the whole purpose of the Clean Water Act, which Congress and the U.S. Supreme Court have said the purpose of this act is to clean up the nation's waters. And so it makes no sense to establish, to identify a water quality limited segment, a section of stream where fish are dying and, you know, people can't swim or drink in it. And then Congress says, okay, you need this pollution prevention plan. But it doesn't matter when you can do it, 1 year, 5 years, 50 years. And that's really the gist of their argument is that there simply is no end point. Isn't that, I don't remember that clearly now, but isn't that pretty much what the San Francisco Baykeeper said? That's what time to time means. It's within the agency's discretion. No. In fact, I think Baykeepers said something quite different from that, Your Honor. In Baykeepers, the plaintiff said you had to submit the TMDL at the same time you identified the stream. And the Court said, no, that's wrong. But what the Court said is that, look. The reason it was wrong was why? Because California had submitted some TMDLs and because California had a schedule that it was following. And therefore, it was not failing in its mandatory duty because it was doing something. And that's why we didn't further that claim in front of, after we lost it to district court, because Montana had done like 130 out of 3,000 TMDLs. And the other thing that Baykeepers says, you know, that it talks about, excuse me for just one second. Baykeepers, I think a fair reading of that case is that under 303D, EPA does have a duty to establish TMDLs. And I don't know. Well, I think that's true. But the problem, I think, in this case is, you know, with the imposition of this mandatory deadline by the district court, right? Okay. Again, what Baykeepers cited that I think is very important here is this EPA guidance memo that was issued in 1997 that said you ought to have schedules ranging from 8 to 13 years. Now, I understand the court's concern about the extent of the remedy. And I would just say once again that the district judge tried to fashion a remedy that was consistent with what EPA's own expert said it could accomplish within a 10-year timeframe and what Montana had established as a matter of state law. And that if EPA at this juncture doesn't believe it can meet that deadline, it can certainly petition the court to remedy the deadline. And in fact, EPA has already missed some of the interim deadlines, and the plaintiffs haven't gone running back into court because we understand that sometimes these TMDLs can take longer than you might look at first blush. And so I think there is adequate room within the court's remedy for EPA to go back and say, we can't meet this timeframe. I think what the court was trying to do is say, look, there has got to be an end date here. The district court stated in one of its orders that the damage to Montana waters is incalculable because these nonpoint source pollution prevention plans have never been established. And so to develop some type of an end date in line of all that evidence is reasonable. I do recognize that it goes beyond the bare remand, but I think if you look at the way the court crafted its order, it tries to give EPA as much discretion as possible within those confines. If I could, Your Honor, just address one additional case that I think is important because EPA relies so heavily on it, and I really don't think it bears on the outcome of this decision, and that is the ONRC action case, which they cite at great length in their brief. The problem in ONRC action is that there was no final agency action, and the plaintiffs literally made it up. They filed the petition under no statute or regulation, and then when the Bureau of Land Management didn't do anything with their petition except send a letter, they filed a suit and said that, no, their failure to do anything was final agency action, and this court said, no, it's not. The crucial difference here is we do have a document, an order dated June 23rd, that is a final agency action. The other thing that was available in ONRC that we don't have here is the ability to sue on individual projects. In ONRC, the court said, well, we're not going to do this programmatic review, but you can come back and challenge a specific timber sale and raise your issues there. This is the end of the road here in terms of the pace of Montana's TMDL development. It is true we could protest the approval of an individual TMDL, but if this court holds that we can't bring an arbitrary and capricious challenge over the pace of TMDL development, then, you know, EPA could rubber stamp Montana's doing nothing for many years, and we would have no ability to try to seek relief, and I really think that that ultimately is the crux of the case. Congress said that the nation's waters need to get cleaned up and that it has to be done soon, and the TMDL program is a clear part of that. From the overall structure of the Clean Water Act, can you derive some sort of timeliness deadline? What EPA argues is that what Congress told them was to go ahead and do the NPDES program first. That was kind of the cornerstone back in 1972, and so even though this 1979 deadline to start under 303D kicked off, EPA said, and I think with some, you know, they're correct at least initially in this, that EPA, you couldn't have held their feet to the fire back in 1979, but I think in 2003, you know, we're 30 years past that, and so I think it's an interpretation of what from time to time means, and I don't think you can find a specific date that said they had to be done, and I think it's going to vary a lot, as any arbitrary and capricious determination will, on the individual facts of the case, but certainly I think by 1996, when this suit was filed, they had one TMDL out of 3,000 that they had never done any of their own high-priority TMDLs that they promised to do, and then they submit this very vague schedule that that is the basis for saying by the district court that I'm going to look at the pace of your TMDL development based upon your own policy regulations and based upon 40 CFR 130, and I'm going to find your actions to be arbitrary and capricious. How does the injunction in joining the state from issuing any permits further the court's objective in trying to get a move the state forward a bit? Well, first of all, it's not a complete ban, as EPA characterizes it. What the court said was you can't issue a new or increased source, so existing NPDES permits get renewed automatically. A new or increased source permit until you do the TMDL. Now, permits require a minimum of 180 days advance notice to the public, and so what the court is saying is before you add more pollution to a water body that you've already determined is polluted, you've got to get the pollution prevention plan in place, and the court referred to 40 CFR 122, little I, I believe is the site, for an EPA reg that says you can't issue permits, new permits, or increased sources in waters that are already violating water quality standards. And so what the court is saying is, all right, if you're going to add more pollution to a water, then just get your TMDL in place first. It in no way prohibits new NPDES permits from being issued. The same with the business about removing streams. I think that that's an unfair characterization. The judge's order says you have to do TMDLs, you have to do all necessary TMDLs for impaired waters. If in the course of doing a TMDL, EPA said, hey, wait a minute, this stream isn't really polluted, our data wasn't any good, or whatever, they could certainly go back to the district court, or they could call up the plaintiffs for that matter and say, this stream doesn't belong on the list, because the last thing we want EPA to do is to spend a bunch of money trying to do a TMDL for a stream that's not really polluted. So they have to go back to the district court to delist. They would have to formally delist the stream, and they would probably have to, yes, they would have to at least give notice to the district court that one of the streams on the list they have found to not be polluted, and that therefore they don't have to do a TMDL. Because the court used the phrase all necessary TMDLs, and if the stream isn't really polluted, then no TMDL is necessary. Unless the court has further questions, I'll conclude my argument. Thank you very much. All right. Thank you, Mr. Toole. I have a couple of points on rebuttal, Your Honor. I would like to point out that the — since the agency didn't make a decision about the pace of development, it was not — it didn't have a defense that it was not arbitrary or irrational, because the district court was not reviewing a decision. And so the agency, as I understand it, had not been given an opportunity to make that decision or present the record that would support that. Our point is that the court could not reach that issue on the basis of what the agency had done. Now, the Plaintiffs' Counsel emphasized the position — Well, I mean, I'm still not sure if I understand the EPA's position completely. Okay. That is — I mean, is it your position that you have no obligation whatsoever to ensure any timeliness? It's our position that EPA has no enforceable obligation through — No enforceable obligation. — through either the — That's a good — Well, I mean, we're talking about a law suit here, Your Honor. We're not talking about the administration of the program. And EPA takes its responsibilities very seriously, and it has a variety of means and ways to try to make this program work for the states. But what we're here talking about is whether a private party can place responsibilities on EPA to do something and have a district court enforce those. And that has to be based on something that's found in law and the requirements that Congress has written. The — it's not that EPA is, quote, trying to immunize itself completely. EPA is trying to — is saying that the federal district courts can't enforce anything more than what Congress required EPA to do. And that's the way — and Section 303D and its regulations do not have a requirement for an end date for completion of all the TMDLs. And this Court recognized that in Baykeeper on page 885 of the decision. The — recognized that EPA interpreted 303D not to have a schedule or an end date, and the Court said we find EPA's interpretation is reasonable. It's a statute — is that a reasonable interpretation of statute is that after the state has completed the list, it must then establish TMDLs for those orders in accordance with its priority ranking. That's interpreting what the state's obligation is, but there's no particular date when it has to be done and there's no requirement that EPA be responsible. So I gather now the EPA would not enter into any consent decrees that imposed any kind of prime requirements on the state. EPA has done that. It has compromised litigation in other states, but the fact that it has done so is not an admission that the law required that. It's in compromise of litigation. EPA's view here, as sustained by the district court and consistent with its Baykeeper provision, is that there was no need for — that Montana was — had an active program and therefore there was no mandatory duty for EPA to step in and take over. There's no, quote, constructive submission from Montana, an expression of a determination not to submit TMDLs or lists. I would point out that at E, Excerpt of Record 45 has the guidance from EPA, which interprets its regulations, and in footnote three of that guidance it says specifically that the schedule that the state might submit will not be subject to formal EPA approval. That is EPA's interpretation of its regulations and its controlling on what the regulations require. And I'll also point out that in the litigation over the remedy, EPA objected first to anything more than a remand. It objected to setting a deadline, and its submission of about 10 years was that it wasn't to re-counter and rebudge plaintiffs' suggestion that three years was an appropriate time to set for the deadline. It's not an admission that the Court could take and justify its failure to remand and impose a deadline that's not required by statute. What about Mr. Tolsky's argument on the NPDES permits about the, well, it's six months to get those anyway? Well, Your Honor, the NPDES permit program operates on a five-year schedule. What the effect of the injunction is, is to say that you can't issue those permits when they come up for renewal unless you've already done the TMDL, which may not be necessary because the regulations, both state and federal regulations, say that permits can be issued if they will not cause or contribute to a violation of the water quality standards for a new source in that nature. But the Court's injunction doesn't allow EPA to handle that in that manner. In other words, make a determination in the permitting process that there's no ---- It's only for the six-month period, right, according to the Court's timetable? Well, the Court was not saying that if the TMDL wasn't ready in six months that the permit could be issued. It was saying ---- it was trying to justify that provision by saying there's a six-month window from the application to before it expires in order to complete the process. But the ---- what the injunction has done is has added new burdens on the permitting process and said TMDLs for those have got to be done on that schedule. And ---- And if you're going to grant a permit, you have to have the TMDL for it. Yes. There are no more questions here. All right. Thank you. We thank both counsel. This case is submitted for decision.
judges: Reavley, Tashima, Paez